DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from the judgment of the Lucas County Court of Common Pleas which, following a jury trial, entered judgment in favor of appellees, Shelly J. Corporation, dba Bottomline Ink ("Bottomline") and Kirk Winnega, against appellant, The Relizon Company ("Relizon"), with respect to its claims of breach of contract, against Winnega, misappropriation of trade secrets, against both appellees, and punitive damages. Relizon's other causes of action against appellees, including conversion, specific performance, breach of fiduciary duty, unfair competition, tortious interference, conspiracy and unjust enrichment, were disposed of pursuant to the trial court's October 7, 2002 judgment entry which granted appellees summary judgment against Relizon with respect to these claims. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} Since June 27, 1988, Kirk Winnega worked as a salesman for the business forms section of the Reynolds and Reynolds Company ("Reynolds"), formerly known as The Arnold Corporation. On June 19, 2000, Reynolds entered into a purchase agreement for the sale of its assets to ISG Acquisition Corporation ("ISG"). On June 30, 2000, as a result of the impending sale of the business forms section of Reynolds, Winnega left Reynolds and began working for Bottomline. Bottomline was a competitor of Reynolds, also selling business forms and other printed materials.
 {¶ 3} At Bottomline, Winnega immediately began selling to the same customers he had sold to when he worked at Reynolds. Also while at Bottomline, Winnega referred to salesman copies of invoices he had received during his employment with Reynolds. In general, these invoices contained customer information, a description of the product sold, Reynolds' cost, and the price for which the product was sold to the customer. Winnega also took with him a customer list, which he testified he never referred to or even knew he had, and a list of manufacturers who were used by Reynolds and with whom Reynolds had negotiated discounts. Winnega testified that he had referred to the manufacturer list for convenience at times, but that any information from the manufacturer's list could have been gotten directly from trade magazines.
 {¶ 4} On July 18, 2000 and July 31, 2000, Winnega received letters from Richard Gurbst, attorney for Reynolds. In the July 18, 2000 letter, Gurbst stated: "As you know, you have an agreement which prohibits certain activities once you leave the employ of the company. In addition, relevant law also prohibits impermissible use of trade secrets and misappropriation of trade secrets, including client files and customer information." Gurbst also stated that Reynolds had information that Winnega was in violation of the law and his agreement with Reynolds. Gurbst stated, "Absent full compliance with your obligations, Reynolds 
Reynolds Company will proceed to protect its interest to the fullest and will not hesitate to file a legal action for an injunction as well as damages, both actual and punitive." Winnega responded by letter dated July 26, 2000 that, to his knowledge, he had not taken or used any trade secrets or misappropriated any other property belonging to Reynolds. Winnega further requested that Gurbst provide him with specific information regarding the alleged violations.
 {¶ 5} On July 31, 2000, Winnega received a second letter from Gurbst which again stated that he was in possession of trade secrets and was violating his employment agreement by soliciting business from Reynolds' customers. Winnega responded by letter on August 8, 2000, stating that he did not remember signing an agreement with Arnold, but that even so, he had been told by his managers that because of the impending sale, Reynolds was not "interested in maintaining" his accounts because they were "too small, transitional and labor intensive." Winnega also emphasized that he had never been provided customers at Reynolds, but rather that he had developed his customer base on his own. Winnega again requested that Gurbst provide him with further information concerning what particular "trade secrets" or "other property of Reynolds Reynolds" he believed Winnega possessed. Winnega was not provided with any further information concerning these allegations until after suit had been filed against him.
 {¶ 6} On August 4, 2000, the sale of Reynolds' assets to ISG was completed. ISG named the business Relizon. The remainder of the Reynolds' company remained intact after the sale of the business forms portion of the company. All of Reynolds' employees, who were remaining at the time of the sale, were contemporaneously fired and then rehired by Relizon. Brian Anderson, who was employed by both Reynolds and Relizon, testified that he signed a new noncompetition agreement with Relizon when Reynolds sold its assets.
 {¶ 7} In particular to the issues in this case, pursuant to the bill of sale, Reynolds attempted to "sell, assign, transfer, convey and deliver" to ISG and its successors and assigns, all of the right, title and interest of the assets of Reynolds and it affiliates, including, in part, all Reynolds' rights "to and under the Transferred Contracts," all Reynolds' rights "under all other contracts, licenses, sublicenses, agreements, leases, commitments, and sales and purchase orders, and under all commitments, bids and offers (to the extent such offers are transferable), to the extent related primarily to the Business," and "all claims, causes of action, choses in action, rights of recovery and rights of setoff of any kind primarily pertaining to or arising out of the Business." Pursuant to the above language in the purchase agreement, Relizon asserted that it was assigned Winnega's employment agreement, signed June 27, 1988, as part of the sale of assets.
 {¶ 8} In pertinent part, Winnega's 1988 agreement stated that all records, customer lists and company memorandum are deemed the property of the company and, "whether furnished to EMPLOYEE by the COMPANY or compiled by EMPLOYEE or from information procured from any of the customers of COMPANY during the course of employment shall upon termination of employment, for any reason, be delivered to COMPANY by EMPLOYEE." The agreement also stated that the company's disclosure of confidential trade information to Winnega, such as customer lists, training, and the good will attached to all customers, including those created during the life of the agreement, belonged to and was the property of the company. As such, Winnega agreed not to disclose company information regarding "its methods, products, customers or business," and agreed not to divulge to any competitor or potential competitor, or apply or use as a competitor of the company, "any of the techniques, business affairs, special training, customer lists, customer prospects, customer requirements, customer transactions, customer work orders, price lists, policies, plans, finances, trade practices, trade secrets, methods, ideas in development, systems, or similar information of COMPANY with which EMPLOYEE becomes acquainted during the time EMPLOYEE was in the employment of COMPANY."
 {¶ 9} For a period of one year after termination of employment, Winnega was prohibited from selling the same or similar products within a 100 mile radius of the county where he was last assigned. For a period of two years following termination of employment with the company, Winnega was prohibited from soliciting business from his former customers. The term COMPANY was defined as "THE ARNOLD CORPORATION — PRINTED COMMUNICATIONS FOR BUSINESS, its Divisions, Subsidiaries and Affiliates." Furthermore, the agreement stated, in pertinent part:
 {¶ 10} "9) It is understood by the parties that the covenants herein contained are for the protection of confidential business information, customer relationships, and trade secrets of COMPANY and that a breach of any covenant herein contained will cause serious damage to COMPANY. EMPLOYEE agrees that damages at law could be an inadequate remedy for the breach of this AGREEMENT and, in addition to any and all other remedies to which COMPANY would be otherwise entitled, COMPANY shall be entitled to injunctive relief with respect thereto."
 {¶ 11} On October 23, 2000, Relizon filed suit against Winnega and Bottomline. Relizon claimed that Winnega breached his contract, converted Relizon's trade secrets and other proprietary and confidential information, and breached his fiduciary duty. Against both Winnega and Bottomline, Relizon claimed misappropriation of trade secrets, to which Bottomline aided and abetted, unfair competition, tortious interference, conspiracy, and unjust enrichment. Relizon pled for specific performance/injunctive relief and punitive damages against both appellees.
 {¶ 12} On May 17, 2002, appellees filed separate motions for summary judgment. On October 7, 2002, the trial court granted appellees' motions with respect to Relizon's claims of conversion, specific performance, aiding and abetting against Bottomline, breach of fiduciary duty, unfair competition, tortious interference with contract relations, civil conspiracy, and unjust enrichment, but denied summary judgment with respect to Relizon's claims against Winnega regarding breach of contract and against both appellees regarding misappropriation of trade secrets and punitive damages. The matter came for jury trial on October 7, 2002. The jury entered a verdict on behalf of appellees. The jury found that Relizon was not assigned Winnega's employment/noncompetition agreement, thereby eliminating Relizon's breach of contract claim against Winnega, and that appellees did not misappropriate trade secrets. Based on it findings, the jury did not consider the issue of punitive damages.
 {¶ 13} Relizon appealed the decision of the trial court and raises the following assignments of error on appeal:
 {¶ 14} "1. The trial court committed reversible error by permitting highly prejudicial and irrelevant testimony and argument — that Relizon had declined to seek the equitable relief of a temporary restraining order or preliminary injunction — ostensibly for the purpose of demonstrating that Relizon failed to mitigate damages.
 {¶ 15} "2. The trial court committed reversible error when it struck Relizon's Senior Vice President and General Manager's second day of testimony.
 {¶ 16} "3. The trial court committed reversible error (a) by holding that it was a question of fact for the jury to decide whether defendant Kirk Winnega's ("Winnega") covenant not to compete was assigned to Relizon and; (b) by giving a confusing and legally incorrect jury instruction regarding this assignment.
 {¶ 17} "4. The trial court committed pretrial error by granting summary judgment for appellees on Relizon's claims of conversion, tortious interference, and unjust enrichment."
 {¶ 18} In its first assignment of error, Relizon argues that the trial court erred in allowing appellees to advance a theory that Relizon failed to mitigate its damages because it did not seek a temporary restraining order ("TRO") or preliminary injunction, and that its failure to pursue such relief demonstrated that Relizon did not believe it had a strong case. We disagree.
 {¶ 19} "[A] determination as to the admissibility of evidence is a matter generally within the sound discretion of the trial court." Schaffter v. Ward (1985), 17 Ohio St.3d 79, 80, citingCalderon v. Sharkey (1982), 70 Ohio St.2d 218. In order for a court to have abused its discretion, more than an error law or judgment must have occurred; rather, an abuse of discretion connotes that the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 20} Relying on Wilson v. Kreusch (1996),111 Ohio App.3d 47, Relizon argues that the doctrine of mitigation of damages does not require extraordinary efforts, which injunctive relief requires, and that for the doctrine to apply, not only must the required expenditure for mitigation be small, the loss saved by that expenditure must be certain and great in comparison. Relizon argues that because it had money damages available to it, it would not have succeeded in pursuing a TRO or preliminary injunction. As such, Relizon asserts that the loss to be saved by the filing of a TRO was not a certainty. Thus, because there was no certainty of success, Relizon argues that whether it sought a TRO was irrelevant and prejudicial because a party's decision not to seek injunctive relief has no bearing, as a matter of law, on whether the party mitigated its damages. Further, Relizon argues that the trial court erred in allowing appellees to elicit testimony from Kelly Henrici, general counsel for Relizon, that Relizon did not pursue a TRO because it was her belief that there was not enough information at the time it filed its complaint to succeed on a motion for injunctive relief.
 {¶ 21} Initially, we find Relizon's reliance on Wilson is misplaced. In Wilson, both parties had breached the employment agreement and, in fact, when injunctive relief was finally sought, the trial court refused to grant such. Accordingly, it was clear that there was no certainty of recovery by pursuing injunctive relief in Wilson. As such, the appellate court held that the employer's recovery should not have been reduced due to his failure to immediately seek injunctive relief. We are not faced with a similar set of facts.
 {¶ 22} Unlike the parties in Wilson, Winnega was the only party who had allegedly breached the terms of the employment contract. Although Relizon asserts that it would not have prevailed with a TRO motion, because no TRO was ever sought, we can never know with certainty whether the trial court would have granted injunctive relief. Appellees argument, however, was not
that Relizon would have been granted injunctive relief had it pursued such at the beginning of the case, but that had a TRO been sought, discovery would have been expedited and the case would have moved along more quickly than it did. By pursuing injunctive relief, damages could have been limited to only a few months during which Winnega allegedly breached his contract. Instead Relizon was seeking over 18 months of lost profits due to Winnega's alleged breach. In any event, Relizon was provided ample opportunity to cross-examine witnesses regarding the mitigation issue. In fact, Relizon established that if it did not have sufficient evidence to pursue a TRO, then it would have been unlawful for it to do so.
 {¶ 23} Accordingly, based on the testimony in this case, we find that the jury was entitled to determine whether Relizon failed to mitigate its damages by not initiating injunctive proceedings and whether appellees met their burden of proof with respect to mitigation. Furthermore, insofar as Relizon pled for injunctive relief in its complaint and had threatened Winnega with it in the letters from Gurbst, we find that it was not an abuse of the trial court's discretion to allow appellees to inquire as to why injunctive relief was not ultimately sought by Relizon.
 {¶ 24} Also, with respect to the mitigation of damages issue, Relizon argues that the trial court erred in allowing the testimony of Attorney Stephen J. Stanford, who was offered as an expert by appellees. In particular, Relizon argues that Stanford was permitted to "instruct" the jury on a matter of law and opine that "if Relizon wanted a quick resolution to the issues and to minimize their damages," it should have sought a temporary retraining order or preliminary injunction, as "[i]t would have resolved the issues very quickly." Relizon argues that the trial court abused its discretion in permitting such testimony. We disagree.
 {¶ 25} Stanford testified that, in his practice he focused on labor and employment law, and that he dealt with issues involving employment agreements and covenants not to compete on a fairly regular basis. In particular, Stanford described the kinds of rights and remedies available to an employer who believes that his employee is violating a covenant not to compete and/or taking trade secrets or confidential information away from the employer. After attempting contact with the employee to get him or her to desist from further violation and to return the employer's documents, Stanford testified that, "if that doesn't bring satisfaction to the employer, the filing of a lawsuit is done. And typically, the quickest way to bring a resolution to the rights would be * * * to ask the Court for a temporary restraining order and a preliminary injunction."
 {¶ 26} Stanford then described for the jury the difference between a temporary restraining order and a preliminary injunction, and what typically can occur when either is sought. With respect to preliminary injunctions, Stanford stated:
 {¶ 27} "* * * it's supposed to be in place essentially maintaining the status quo. For instance, if the employer believes that it's being irreparably harmed, which is what you need in order to get a temporary restraining order-preliminary injunction by employee [sic] working for a competitor, the employer could ask the Court for an order prohibiting that employee from working at the [competitor's], prohibiting the employee to disclose trade secrets and the sort."
 {¶ 28} Stanford also testified that expedited discovery will often take place in a case where a temporary restraining order has been issued. The expedited discovery allows the court to be provided with adequate information about the case before the preliminary injunction hearing, where it will determine whether an injunction should stay in place during the pendency of the case. Stanford described the benefit to employer and employee, with respect to expediting the process, as follows:
 {¶ 29} "From the employer standpoint, if the employer believes that the employee is violating a covenant not to compete or has some trade secret that is being used and is being irreparably harmed by this, the employer essentially gets a decision from the court within two or three weeks after the filing of the complaint.
 {¶ 30} "And so * * * the employer's typical interest is they want to prevent the wrongful use of any sort of trade secret information and they want to prevent, [and] stop the breach of what they feel is a covenant not to compete. And the quickest and most effective way to do that is by the filing of a TRO, temporary restraining order and a preliminary injunction.
 {¶ 31} "* * * from the employee's standpoint and from the new employer's standpoint it's also beneficial because * * * there is some fairly definitive resolution of what the rights are between these three parties on a very quick basis."
 {¶ 32} Stanford was ultimately asked for his opinion within a reasonable degree of certainty regarding whether Relizon failed to mitigate its damages by not seeking a temporary restraining order. Stanford testified that, based upon his 27 years of experience in this area of law, that "* * * if they wanted a quick resolution to the issues and [to] minimize their damages, they should have asked for a temporary restraining order and preliminary injunction. It would have resolved the issues very quickly."
 {¶ 33} On cross-examination, Stanford clarified that it was not his opinion that Relizon would have been successful had it pursued a TRO, but that in an attempt to mitigate its damages, it should have "at least tried to get a preliminary injunction or temporary restraining order." Stanford further testified that in this type of case, the employer's damages could never be entirely remedied by money damages. Nevertheless, he conceded on cross-examination that if he believed that he did not have the appropriate evidence to support a TRO or preliminary injunction, he should not file it.
 {¶ 34} Contrary to Relizon's argument, we find that Stanford did not opine as to how a judge would have ruled on a TRO in this case. He also did not render a statement of the law concerning injunctive relief or provide instruction which the trial court should have provided. Rather, Stanford testified regarding matters not known to lay persons concerning the nature of TRO's and preliminary injunctions, the typical procedure for both, and how discovery proceeds when injunctive relief is sought. He also testified that injunctive relief is often sought in these types of cases because of the desire for a quick resolution and because an aggrieved employer can never be fully remedied by monetary damages alone. He did render an opinion regarding whether he believed Relizon failed to mitigate their damages, but such is a matter of opinion and not a statement of the law. The jury was certainly capable to considering Stanford's testimony and Henrici's testimony to determine whether Relizon should have sought injunctive relief.
 {¶ 35} Accordingly, we find that the trial court did not abuse its discretion in allowing Stanford's testimony. Moreover, insofar as we find that Stanford did not render a statement on the law or otherwise provide instruction which should be provided by the trial court, we find that Relizon's reliance on UnitedStates v. Zipkin (6th Cir. 1984), 729 F.2d 384, and State v.Villareal (Sept. 14, 2001), 6th Dist. No. H-01-001 H-01-002, is misplaced.
 {¶ 36} Relizon further argues that defense counsel deliberately confused the issues of mitigation and liability. We find no evidence of such during the course of the testimony. The only reference to Relizon not believing it had a strong case for injunctive relief came directly from Henrici's testimony, Relizon's general counsel. The defense was certainly entitled to revisit such testimony during closing arguments, as was counsel for Relizon. Additionally, we note that no objection was raised to appellees' closing arguments. As such, any alleged error with respect to the arguments is waived.
 {¶ 37} Based on the foregoing, we find that the trial court did not abuse its discretion in permitting appellees to question witnesses regarding whether Relizon failed to mitigate its damages by failing to pursue injunctive relief. Relizon's first assignment of error is therefore found not well-taken.
 {¶ 38} Relizon argues in its second assignment of error that the trial court erred when it struck the second day of testimony of Relizon's Executive Vice President, David Holland. We disagree.
 {¶ 39} Holland began to testify on Monday, October 7, 2002. His testimony eventually concerned a document that was the subject of a motion in limine filed by Bottomline. The trial court took a recess to consider the objections and stated in open court:
 {¶ 40} "Members of the jury, it's 20 after 2:00. There may be a slight delay here with this objection. So we're going to allow you to leave the room for a short time. Please do not discuss the case among yourselves. And the witness then is instructed not to talk about the case with the attorneys in the meantime as well."
 {¶ 41} Appellees objected to Holland testifying about Exhibit 43, which consisted of a compilation of Winnega's sales prior to leaving Reynolds and a computation of adjusted gross profit for each of his sales. Appellees argued that although such a compilation of information had been requested, Relizon failed to produce such information until immediately before trial. Appellees also objected to Holland's testimony regarding the exhibit because he did not prepare the document and was not offered as an expert witness. To enable appellees to consult with their accountant regarding Exhibit 43, the trial court ordered that Holland's testimony was not to resume until the following morning. In the meantime, another witness was called by Relizon to testify.
 {¶ 42} The following morning, Holland testified regarding Exhibit 43. In his testimony on the second day, Holland (1) laid the foundation for the introduction of the exhibit; (2) explained how the adjusted gross profit figure was computed; (3) identified Exhibits 47, 48 and 49, which contained Reynolds' sales and adjusted gross profit information, with respect to the same customers listed in Exhibit 43, during the 18 months after Winnega's departure; (4) stated that had Winnega stayed on with Reynolds, he was on track for making $685,176.31 in adjusted gross profits for Reynolds' over the next two years, but that since he left, the company only made $20,143.38 in adjusted gross profit; and (5) testified that in order to retain Winnega's customers, Reynolds contacted customers through management and sales people and hired three to four new sales persons to service those customers. Holland also testified that he attributed Reynolds' inability to maintain its customers on Winnega's sudden departure, the lack of a smooth transition from Winnega to new Reynolds' salespersons, and the information that Winnega took from Reynolds over to Bottomline.
 {¶ 43} Holland was then extensively cross-examined by appellees. During Bottomline's cross-examination, it was discovered that Holland himself had not requested that Exhibit 43 be generated himself, but that Dixie Howard in Sales Operations had requested the compilation. Although Howard had not given Holland the compilation, Holland testified that he had confirmed with Howard on Monday evening that she, in fact, had generated the document. Bottomline's counsel then asked Holland, "Who else did you talk about this document with last evening?" Holland testified that he spoke with Tom Kovatch, Relizon's attorney, about the document, but not about his testimony. Appellees objected to Holland's testimony because he had been admonished by the court not to discuss the case with his attorneys during the recess in his testimony.
 {¶ 44} After hearing lengthy arguments from counsel, the trial court held that "the record was clear that the witness was instructed not to discuss the case in the meantime." The trial court also held that "* * * [o]nce the direct examination begins, the attorney should not be allowed to then clarify or coach the witness in any way." In making its ruling, the trial court relied upon Gedders v. United States (1966), 425 U.S. 80, wherein the court held that the judge has power to control progress and the shape of the trial; State v. Prater (1983), 13 Ohio App.3d 98, which held that talking to the witness during cross-examination was improper; and State v. Sage (Nov. 3, 1983), 10th Dist. No. 82-AP-1983, which held that as applied to nonparty witnesses, orders not to consult with attorneys during recesses were within the trial court's sound discretion.
 {¶ 45} The trial court considered four options to deal with the violation of the court's order: dismissal of the case, mistrial, striking of the testimony, or full cross-examination to develop any prejudice to appellees. The trial court determined that the second day of Holland's testimony would be stricken, this included the cross-examination that had also occurred on the second day of his testimony. The trial court instructed the jury as follows:
 {¶ 46} "For reasons which you should not concern yourself with, you are instructed to disregard testimony that was presented today. So that is a motion to strike that was granted. Then do not consider the testimony given this morning."
 {¶ 47} With respect to the above, Relizon argues that the trial court erred in determining that Holland was a mere "nonparty" witness because he was not named in the complaint. Relizon argues that, pursuant to R.C. 2317.021, Holland was a "client," not a "nonparty" witness, because he was a representative of the corporation. As a client, Relizon argues that Holland had a Fifth Amendment right to due process, including a right to counsel. Relizon argues that, by prohibiting Holland from consulting with his attorney during breaks and recesses during direct examination, the trial court encroached on that right. In support of its arguments, Relizon relies on Boardof Commrs. on Grievances and Discipline (Aug. 17, 1996), Opinion 90-20, Potashnick v. Port City Const. Co. (5th Cir. 1980),609 F.2d 1101, Geders v. United States (1976), 425 U.S. 80, In reStratosphere Corp. Securities Litigation (D. Nev. 1998),182 F.R.D. 614, and Thompson v. The Atlantic Building Corp.
(D.C.App. 1954), 107 A.2d 784.
 {¶ 48} The trial court has the authority to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth. Evid.R. 611(A). A trial court's decisions on Evid.R. 611(A) matters will not be overturned absent an abuse of discretion.State v. Smith (2002), 4th Dist. No. 01CA13, 2002-Ohio-3402, at ¶ 23.
 {¶ 49} The right to retain counsel in civil litigation is implicit in the concept of Fifth Amendment Due Process rights.Potashnick v. Port City Const. Co. (5th Cir. 1980),609 F.2d 1101, 1117, citing Powell v. Alabama (1932), 287 U.S. 45, 69, and Cooke v. United States (1925), 267 U.S. 517, 537. As in criminal cases, it is presumed that civil litigants usually lack the skill and knowledge to adequately prepare their case and, thus, require the guiding hand of counsel at every step in the proceedings. Id. at 1118, citing, Powell, supra. In Geders,425 U.S. 80, 88, the United States Supreme Court emphasized the reasoning behind allowing communication between attorney and client during trial recesses:
 {¶ 50} "It is common practice during such [overnight] recesses for an accused and counsel to discuss the events of the day's trial. Such recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier. At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events. Our cases recognize that the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance."
 {¶ 51} Even though the need for attorney-client communication is certainly no less in a civil case, the Potashnick court recognized that because a criminal defendant is faced with a potential loss of his personal liberty, and therefore has much more at stake than a civil litigant asserting or contesting a claim for damages, the law affords greater protection to the criminal defendant's rights. Potashnick at 1118. Despite the fact that greater protection is afforded to a criminal defendant, the United States Supreme Court nevertheless held that "when a [criminal] defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying." Perryv. Leeke (1989), 488 U.S. 272, 281. The rationale for this rule being that when a defendant "assumes the role of a witness, the rules that generally apply to other witnesses — rules that serve the truth-seeking function of the trial — are generally applicable to him as well." Id. Accordingly, Perry held:
 {¶ 52} "[I]t is entirely appropriate for a trial judge to decide, after listening to the direct examination of any witness, whether the defendant or a nondefendant, that cross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer." Id. at 282.
 {¶ 53} In this case, Relizon argues that because Holland was Senior Vice President and General Manager of Relizon, he was actually the client and a party to the action. As such, Relizon argues that the trial court impinged upon his due process rights by prohibiting him from speaking with counsel during the overnight break. We disagree.
 {¶ 54} First, we find that Holland was not a party in this case and was not the "client" at trial. None of his actions could have created liability on behalf of Relizon, he was not the only officer available to testify on behalf of Relizon, and, in fact, he was not even permitted to be in the courtroom during the pendency of the trial, insofar as general counsel for Relizon was present as its representative. Relizon relies on R.C. 2317.021,Board of Commrs. on Grievances and Discipline (Aug. 17, 1996), Opinion 90-20, and Potashnick, supra, as support for its argument that Holland was the client. We, however, find that Relizon's reliance on these sources is misplaced.
 {¶ 55} R.C. 2317.021 and the Board of Grievances' opinion only discuss who is a client for purposes of determining who is entitled to attorney-client privileges. Insofar as neither source lends guidance as to who would be considered a party at trial, where a corporation is the only named party, we find them to be inapplicable in this case. In Potashnick, the court found that the president and sole shareholder of the company was the "party" because he was the only person available to represent the corporation. As such, the court held that it was improper to prohibit him from consulting with corporate counsel during several consecutive overnight recesses. Potashnick, supra. We, however, are not faced with the same situation as was present inPotashnick because, although Holland was an officer of the corporation, he was not the only person available to discuss trial strategy and the like. Rather, Henrici was available to assist trial counsel in that regard and was present throughout all the witnesses' testimony.
 {¶ 56} Second, we note that the purpose of not allowing a witness to consult with counsel during the course of his testimony is to prevent coaching from the attorney and to foster the truth-seeking function of trial. See Geders and Perry,
supra. In this case, Relizon attempted to introduce Exhibit 43, appellees objected, the trial court recessed Holland's testimony and ordered him "not to talk about the case with the attorneys in the meantime * * *." Thereafter, after much discussion, the trial court informed counsel for Relizon that without proper foundation being laid, the document would not be admitted. During the overnight recess which followed, Holland discussed Exhibit 43 with counsel. Then, because he had not prepared the document himself, or even asked for the document to be prepared, he testified that he confirmed with Dixie Howard that she had been the person to request the compilation exhibit.
 {¶ 57} Based on the testimony, it is evident to this court that Holland's consultation with counsel concerned his ability to lay the foundation for the admission of Exhibit 43 during his testimony the following day. This would appear to be precisely the type of coaching sought to be avoided by the trial court when it issued its admonition to Holland at the time of the break in his testimony.
 {¶ 58} Relizon further argues that the sanction was excessive and that it was not tailored to remedy the alleged wrong, but to punish Relizon. We disagree. Rather than dismissing Relizon's case, the trial court struck Holland's testimony and allowed Relizon to establish the identical facts through the testimony of other witnesses, which it did. Relizon asserts that the court's sanction was prejudicial because of the message it sent to the jury, i.e., that Relizon "would go to any lengths — even `improperly' discussing testimony — to win the case." We, however, find that any prejudice in this respect was solely the result of Relizon's own actions.
 {¶ 59} Accordingly, we find that Holland was not a party to the action and, as such, no violation of his due process rights occurred. As with any witness, the trial court was within its authority, pursuant to Evid.R. 611(A), to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth. Under the facts in this case, we find that the trial court's order was reasonable and was not an abuse of its discretion. We further find that the trial court did not abuse its discretion in ordering the second day of Holland's testimony stricken. Relizon's second assignment of error is therefore found not well-taken.
 {¶ 60} Relizon argues in its third assignment of error that the trial court erred in presenting to the jury the question of whether Winnega's covenant not to compete was assigned to Relizon. In particular, Relizon argues that under Ohio law, a covenant not to compete may be assigned as a matter of law, even if the covenant is silent as to assignability. In support of this position, Relizon relies on Rogers v. Runfola Assoc., Inc.
(1991), 57 Ohio St.3d 5, and Artromick Internatl., Inc. v. Koch
(2001), 143 Ohio App.3d 805. Relizon asserts that because the purchase agreement with Reynolds expressly stated that Relizon was acquiring all employment agreements, Winnega's contract was properly assigned to and was enforceable by Relizon, despite the fact that Winnega's contract was silent as to assignability.
 {¶ 61} When there has been no change in ownership and the company remains essentially the same after the merger or transfer of assets, Ohio courts have held that the covenants not to compete are properly assignable to and enforceable by the new company, even when the noncompetition agreement does not address assignability. See, e.g., Rogers, supra., and C.A. Litzler Co.v. Libby (Aug. 12, 1991), 5th Dist. No. CA-8512.
 {¶ 62} In Rogers, the employee signed a covenant not to compete with Thomas Runfola, who at the time, was doing business as a sole proprietor. The agreement was silent as to assignability. Thereafter, Runfola created a corporation and transferred and assigned all the assets of the sole proprietorship into the corporation. The Ohio Supreme Court relied on several factors when determining that the covenant not to compete had been properly assigned: (1) there was no change in the ownership of the business, (2) the employee stayed on with the business knowing that it had been incorporated, and (3) the change in the business structure had no effect on her duties or daily operations. Rogers, 57 Ohio St.3d at 7.
 {¶ 63} In Litzler, an employee had signed a restrictive covenant with Quickdraft. Thereafter, Quickdraft merged with Litzler, but continued in the same business as one of Litzler's divisions. In finding that the noncompetition agreement was properly assigned and enforceable, the court in Litzler held that "[a] restrictive covenant is properly assigned where only the legal structure of the business has changed and no additional burdens are placed on the employee as a result of the change."Litzler, citing Rogers at 7.
 {¶ 64} However, where the noncompetition agreement is silent as to assignability, and there has been a change in ownership of the business, the controlling factor in determining assignability of a covenant not to compete is the intention of the contracting parties. Rock of Ages Memorial, Inc. v. Braido (Feb. 8, 2002), 7th Dist. No. 00 BA 50, citing, Mid-West Presort MailingServices, Inc. v. Clark (Feb. 10, 1988), 9th Dist. No. 13215. Generally, covenants not to compete are meant to protect a business's goodwill. See Rogers, supra., and Rock of Ages. As recognized in Rock of Ages, "[a]s part of the goodwill of a business which he buys, a buyer normally wants the chance to make the customers of that business his own." Notwithstanding, genuine issues of material fact may exist concerning what the contracting parties intended to protect when they entered into the covenant not to compete and, thus whether assignment of the covenant is necessary to maintain that protection. See Rock of Ages, supra.
 {¶ 65} Relizon argues that pursuant to Rogers, supra., andArtromick, supra., the trial court should have found that Winnega's noncompetition agreement was assigned to Relizon from Reynolds as a matter of law. We disagree. In Rogers, the transfer of assets from the sole proprietorship to the corporation did not create a new business. The business was the same before the transfer as after, it was just incorporated. Such is not the situation in the case at bar. Reynolds still existed after the sale of the business forms portions of its company. Relizon was an entirely separate corporation from Reynolds. In fact, employees of Reynolds and Relizon testified that they were contemporaneously fired and then rehired by Relizon. In particular, Anderson testified that he signed a new noncompetition agreement directly with Relizon after the sale.
 {¶ 66} With respect to Artromick, we find Relizon's reliance on it is also misplaced. In Artromick, the employee signed a noncompetition agreement with Drustar. The agreement was silent as to assignability. The employee resigned from Drustar and, three days later, Artromick purchased Drustar's assets, including its rights under the employee's confidentiality and noncompetition agreement. When Artromick sued the employee, the trial court found that the agreement was not assignable as a matter of law. In overturning the trial court, the Tenth District Court of Appeals held that the noncompetition agreement could be enforced, but, rather than finding that the agreement was assignable as a matter of law, the court remanded the matter to the trial court for further proceedings.
 {¶ 67} We recognize that Winnega's employment agreement could have been assigned to Relizon pursuant to the purchase agreement. However, after a thorough review of the trial proceedings, we agree with the trial court that there were genuine issues of material fact in this case which prevented the trial court from finding, as a matter of law, that Winnega's employment contract had been assigned to Relizon and could be enforced against him. For instance, none of the factors considered by the Ohio Supreme Court in Rogers, which led the court to conclude that the noncompetition agreement had been assigned, are present in this case. Relizon was a separate corporation from Reynolds; Reynolds still existed as a corporation; and Winnega never worked for Relizon. Plus, there was evidence that after the sale, Relizon employees were required to enter into new noncompetition agreements directly with Relizon. Moreover, although Winnega was not present after the sale to Relizon, changes in the business structure were contemplated with respect to Winnega's duties and daily operations. Specifically, Winnega was informed by Reynolds' management that the type of accounts Winnega served were too labor intensive for the company to continue servicing. Winnega was also told that his salary structure could change and that he may be required to work at home with no support staff.
 {¶ 68} Given the foregoing, we find that there was a genuine issue of material fact regarding what Reynolds' intention was with respect to Winnega's noncompetition agreement. Winnega was led to believe that his customers would not be serviced by the company any longer because the focus was going to be on larger businesses. Presuming that "good will" is what is protected by a covenant not to compete, under these circumstances, it is unclear what "good will" Reynolds and/or Relizon sought to protect with respect to Winnega's customers. If the customers were no longer going to be serviced, there arguably would be no "good will" that needed to be maintained.
 {¶ 69} We also find that there was a genuine issue of material fact with respect to what Winnega's intent was at the time he signed the noncompetition agreement with Arnold. Although Winnega did not remember actually signing the noncompetition agreement, there was no evidence that he intended to be bound by an employment contract with another company for which he never even worked.
 {¶ 70} Given the genuine issues of material fact, we find that the trial court was correct in submitting the issue of assignability of the noncompetition agreement to the jury for its consideration. Relizon, however, also argues that the trial court gave a confusing and legally incorrect jury instruction regarding the assignment of the agreement. We disagree.
 {¶ 71} With respect to the assignability of the employment contract, the trial court gave the jury the following instruction:
 {¶ 72} "[T]he first question for the jury to decide is whether there was an intent of Arnold Graphics, Reynolds 
Reynolds, to assign its contract to Relizon. To determine whether there was an assignment, you must determine whether the agreement expressly stated it could be assigned or if the purpose of the agreement was that it could be assigned."
 {¶ 73} The language for this instruction came from Rock ofAges, supra. Relizon had objected to the use of the "intent" analysis, however, with respect to the actual language of the instruction given by the court concerning the issue of assignability, counsel for Relizon stated:
 {¶ 74} "MR. SPRENGER: Your Honor, I think we addressed that at least yesterday in if [sic] Rock of Ages case yesterday. It fully discusses the intention, purposes to be assigned to protect the interest. If you want me to respond further, I will. But I think Rock of Ages in the discussion yesterday adequately covers what you've designed here.
 {¶ 75} "THE COURT: Are you satisfied with the way it's stated here?
 {¶ 76} "MR. SPRENGER: I am, Your Honor. I believe — I believe it reflects Rock of Ages which is the only case on intent after the Supreme Court decision of Rogers * * *. So I think this adequately reflects the state of the law assuming you take the intent approach."
 {¶ 77} We find that the language of the jury instruction is not confusing and adequately reflects the statement of law contained in Rock of Ages. Moreover, we note that not only did Relizon fail to object to the wording of the instruction, it explicitly approved the wording used by the trial court.
 {¶ 78} Finally, Relizon argues that the jury's verdict was against the manifest weight of the evidence. We again disagree. There was sufficient evidence upon which the jury could have relied to find that the noncompetition agreement was not assigned or assignable to Relizon. The agreement contained no language of assignability and it was not established that it was the intention of both Reynolds and Winnega to have the noncompetition agreement be assignable to and enforceable by Relizon. Accordingly, we find that the jury did not lose its way or create a manifest miscarriage of justice in finding that Relizon was not entitled to enforce Winnega's noncompetition agreement against him.
 {¶ 79} For the reasons stated above, we find Relizon's third assignment of error not well-taken.
 {¶ 80} In its fourth assignment of error, Relizon argues that the trial court erred in granting summary judgment against Relizon on its claims of conversion, tortious interference, and unjust enrichment. This court notes at the outset that in reviewing a motion for summary judgment, we must apply the same standard as the trial court. Lorain Natl. Bank v. SaratogaApts. (1989), 61 Ohio App.3d 127, 129. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
 {¶ 81} "Conversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." State ex rel. Toma v. Corrigan (2001),92 Ohio St.3d 589, citing, Joyce v. Gen. Motors Corp. (1990),49 Ohio St.3d 93, 96. Relizon argues that Winnega converted its property by taking "over 600 annotated Reynolds' invoices and used them in furtherance of his business at Bottomline," a list of Reynolds' customers, and a list of Reynolds' approved trade partners.
 {¶ 82} In construing the evidence in a light most favorable to Relizon, Relizon failed to establish a genuine issue of material fact with respect to whether Winnega exercised dominion over the invoices, customer list, or list of trade partners, to the exclusion of the rights of Reynolds or Relizon. Winnega was given the invoices for his personal use while he worked at Reynolds. The invoices contained information that Winnega used to compute his commissions and he retained the invoices for income tax purposes. Winnega believed those copies of the invoices to be his property. Neither Relizon or Reynolds asked for return of the invoices. Moreover, Relizon had copies of all the invoices in the job jackets maintained by Reynolds. Likewise, with respect to the list of customers and trade partners, these were copies of lists that were distributed to all the salesmen for their use. There was no evidence that Winnega knew he had the customer list in his possession, let alone used it. Although the list of approved trade partners had been generated by Reynolds, and contained a listing of trade partners with whom it had negotiated discounts, the contact information contained therein was not exclusive to Reynolds or Relizon as it was available through industry trade magazines. Accordingly, the trial court properly granted summary judgment with respect to Relizon's conversion claim.
 {¶ 83} "In order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." Kentyv. Transamerica Premium Ins. Co. (1995), 72 Ohio St.3d 415, paragraph two of the syllabus. Upon a review of the record, we find that Relizon failed to establish the elements of tortious interference. The business forms industry is highly competitive, with customers often switching sources to get the best price. There was no evidence that Reynolds or Relizon had contracts with any of its customers with which appellees could interfere. Having failed to establish the necessary elements, we find that the trial court properly granted appellees' summary judgment with respect to Relizon's claim of tortious interference.
 {¶ 84} In order to establish that appellees were unjustly enriched, Relizon had to establish: "(1) a benefit was conferred by plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." Hambleton v. R.G. Barry Corp. (1984),12 Ohio St.3d 179, 183. Additionally, "[i]n the absence of fraud or bad faith, a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give in return." Ullmann v. May
(1947), 147 Ohio St. 468, paragraph four of the syllabus.
 {¶ 85} Upon review of the record, we find, after construing the evidence in favor of Relizon, that the information Winnega used to solicit business while with Bottomline was obtained through his own efforts and expertise. Neither Reynolds or Relizon provided Winnega with a single client name; rather, Winnega procured each customer on his own. As such, we find that Relizon failed to establish that it conferred a benefit on Winnega and Bottomline. Moreover, we find that Reynolds paid Winnega to sell its goods and services, which he did. Insofar as there is no evidence of fraud or bad faith, we find that Relizon was not entitled to compensation on the ground of unjust enrichment because Reynolds had received from Winnega that which was agreed to between them. We therefore find that the trial court properly granted summary judgment with respect to Relizon's claim for unjust enrichment.
 {¶ 86} Based on a review of the record, we find that reasonable minds could only conclude that appellees were entitled to judgment as a matter of law with respect to Relizon's claims of conversion, tortious interference and unjust enrichment. Accordingly, Relizon's fourth assignment of error is found not well-taken.
 {¶ 87} On consideration whereof, the court finds substantial justice has been done the party complaining and the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, costs are assessed to appellants.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Knepper, J., Pietrykowski, J. Concur.